UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BARLETTA HEAVY DIVISION, INC. )
                              )
            Plaintiff,        )    CIVIL ACTION NO.
                              )    07-12084-DPW
        v.                    )
                              )
                              )
LAYNE CHRISTENSEN COMPANY     )
                              )
            Defendant.        )
                              )
                              )

MEMORANDUM AND ORDER
April 13, 2011

Post-trial motions were made by plaintiff Barletta Heavy Division, Inc. ("Barletta") and defendant Layne Christensen Company related to their dispute with respect to liability and indemnification for third-party claims. The claims arise out of the performance by a Layne Christensen Company division of a subcontract with Barletta. This Memorandum details the grounds upon which I have disposed of the motions.[1]

## I. BACKGROUND

### A.  *Factual Background*

Barletta entered into a contract (the "General Contract") with the Massachusetts Bay Transportation Authority ("MBTA") to be the general contractor for the Charles/MGH Red Line Station Accessibility and Modernization Project (the "Project"). On April 30, 2003, Barletta and Layne GeoConstruction, a division of

---

[1] By electronic order entered March 31, 2011, I disposed of the motions in a barebones fashion, promising a Memorandum of decision to follow shortly.  This is that Memorandum.

Layne Christensen Company, (collectively, "Layne") concluded a subcontract agreement (the "Subcontract") whereby Layne would undertake various drilling operations in furtherance of the Project, including the installation of micro piles.

Pursuant to a provision in the Subcontract discussed below, Layne named Barletta as an "additional insured" in its commercial general liability insurance policy issued by Zurich American Insurance Company ("Zurich"). The policy had a $2,000,000 limit and a deductible in the amount of $500,000. Layne provided a certificate of insurance to Barletta, as required by the Subcontract. The certificate did not mention the deductible, but did note that "[t]he insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies."

In June of 2006, Layne submitted a Proposal/Quotation for the drilling of 20 mini piles (ultimately reduced to 19) under the Subcontract. Barletta accepted the Proposal/Quotation and issued a change order to the Subcontract incorporating it into the agreement between the parties.

Layne then commenced work under the change order, and that work resulted in the property damage and third-party claims at issue in this action. Richard Parella and Alan Lane, Jr. claimed that they suffered damage to their property at 3 Lindall Place in Boston, Massachusetts, on or about July 8 and July 9 of 2006, due

to flooding (the "3 Lindall Place claim").  Barletta settled the

3 Lindall Place claim for $42,457.97.  Separately, the MBTA

asserted a claim against Barletta for damages related to the

severing of a signal cable on July 12, 2006 (the "MBTA claim").

Barletta settled the MBTA claim for $316,018.48.

**B.    *Disputed Subcontract Provisions***

The parties dispute the meaning and effect of certain terms

of the Subcontract.  These provisions relate to the allocation of

liability for damages or claims arising out of Layne's work and

to Layne's obligation to procure liability insurance covering

claims made against Barletta.

1.  Provisions Related to the Allocation of Liability

Layne's general duty of care with respect to its performance

of the Subcontract and its responsibility for damages arising out

of its work is set out in Article 7.1 of the Subcontract:

> The Subcontractor shall take all reasonable safety
> precautions regarding the performance of its Work and
> operations and shall comply with all applicable laws,
> ordinances, rules, regulations and orders . . . as well
> as complying with any and all safety measures required
> by any safety plans relating to the General Contract.
> The Subcontractor shall, at its own expense, preserve
> and protect from injury all property and persons which
> may be affected by its operations hereunder and shall
> be fully responsible for all damage or expense to any
> person or any property arising from or in consequence
> of any act or omission of the Subcontractor under this
> Agreement.

The parties dispute whether Article 7.1 is limited by

provisions appearing in the Proposal/Quotation for Layne's work

on the mini piles.  The change order states that "Layne

GeoConstruction['s] attached quotation dated June 1, 2006, is
included and part of this agreement with the exception of
conflicts with the Contract requirements."  Schedule A to Layne's
Proposal/Quotation includes the following at ¶¶ 10 and 22:

> 10.  Location, protection and relocation or removal of
> all underground and overhead utilities, structures, and
> obstructions that interfere with our operations.  Layne
> will not be held responsible for any damages to the
> above.
>
> . . .
>
> 22.  All liability for control of run-off from the work
> site is excluded from this proposal and is the
> responsibility of others.

In addition, the parties dispute the scope of the
indemnification provision at Article 4.1 of the Subcontract,
which provides in relevant part:

> The Subcontractor shall indemnify, defend and hold the
> Contractor . . . harmless from and against any and all
> claims, losses, costs, damages, liabilities [etc.] . .
> ., caused in whole or in part by any negligent act or
> omission of the Subcontractor . . . .
> . . .
>
> This indemnification agreement is binding on the
> Subcontractor to the fullest extent permitted by law,
> regardless of whether any or all the persons and
> entities indemnified hereunder are responsible in part
> for the claims, damages, losses or expenses for which
> the Subcontractor is obligated to provide
> indemnification.  The Subcontractor, however, shall not
> be obligated under this contract to indemnify the Owner
> or Contractor for claims arising from the negligence or
> willful misconduct of the Owner or the Contractor or
> their agents, employees or independent contractors who
> are directly responsible to the Owner or the
> Contractor.

(as modified by Exhibit H to the Subcontract).

## 2. Insurance Provision and Exhibit C

Article 3.1 of the Subcontract sets out Layne's obligation to procure insurance for work on the Subcontract. It states in relevant part:

> Subcontractor shall maintain and pay for all insurance of the types and equal to or greater than the limits as required of the General Contractor in the [General] Contract Documents and as set forth on the attached . . . Exhibit C . . . . Subcontractor shall forward an executed Certificate of Insurance to the Contractor with the return of this Subcontract. . . . The General Contractor shall be named as an 'additional insured' on the general and automobile liability policies . . . .

(as modified by Exhibit H to the Subcontract).

Exhibit C outlines the types and amounts of insurance that Layne was required to procure. At Section I.A, Exhibit C provides that:

> The Subcontractor shall purchase and maintain . . . insurance as will protect the Subcontractor, Owner, Owner's Representative and Contractor from claims set forth below which may arise out of or result from the Subcontractor's operations under the subcontract, whether such operations be by the Subcontractor or by any Subcontractor or by anyone directly or indirectly employed by any of them or by anyone for whose acts any of them may be liable:
>
> . . .
>
> 5. Claims for damages because of injury to or destruction of tangible property, including loss of use resulting therefrom.

Exhibit C also specifies that the policy limit for property damage under the comprehensive general liability policy must be $2,000,000.

## C.  *Procedural Background*

Barletta brought this action against Layne for the costs of defending and settling the 3 Lindall Place and the MBTA claims and for Barletta's attorney's fees related to the enforcement of the Subcontract against Layne.  Barletta alleged that the property damage incurred by the third parties had resulted from Layne's negligence in performance of the Subcontract.  Barletta further contended that Layne had a duty to defend and indemnify Barletta, based on Article 7.1, Layne's contractual obligation to procure liability insurance naming Barletta as an additional insured, and Layne's negligence.

Layne denied that it acted negligently or that it caused the property damages and argued that ¶¶ 10 and 22 of Schedule A to the Proposal/Quotation constituted waiver and release by Barletta of any liability or indemnification by Layne with respect to damage to 3 Lindall Place and the cable.  Layne also brought a counterclaim against Barletta for breach of contract and unjust enrichment due to Barletta's failure to pay amounts owed to Layne, namely $135,035.85 invoiced by Layne for work performed and $28,337.13 in retainage holdback, amounts which have now belatedly been tendered to Layne by Barletta.

Additionally, both parties asserted that the other had violated MASS. GEN. LAWS ch. 93A by committing unfair or deceptive trade acts in their contractual dealings.  I dismissed Barletta's ch. 93A claim on motion by Layne for summary

judgment, but Layne's claim is currently before me, along with a motion for Rule 11 sanctions against Barletta's counsel.

I set trial for the resolution of certain factual disputes. In response to special questions, the jury found that while Layne was "negligent in connection with the severing of the MBTA cables," its negligence was not a "substantial factor in causing damage" to the cable. The jury also found that Layne was not "negligent in connection with the water damage at 3 Lindall Place" although the water damage did "arise" out of Layne's drilling operations. With respect to ¶¶ 10 and 22 to Schedule A, the jury determined that the severed cable was an "overhead utility" and an "obstruction that interfere[d] with [Layne's] operations" within the meaning of ¶ 10. It further found that 3 Lindall Place was a "structure" under ¶ 10 and that the water damage to 3 Lindall Place was caused by "run-off" within the meaning of ¶ 22.

Barletta has challenged the jury's findings and moved for a new trial and for judgment as a matter of law that Layne's negligence contributed to the damage to the cable and 3 Lindall Place. Both parties have moved for judgment as a matter of law as to whether ¶¶ 10 and 22 of Schedule A constitute a waiver or release by Barletta of claims related to the cable and 3 Lindall Place.

## D. *The Insurance Coverage Ligation*

Concurrently with the instant action, Barletta pursued

7

declaratory judgment against Zurich in Norfolk County Superior Court.  *Barletta Heavy Div., Inc. v. Zurich American Ins. Co.*, No. 06-01972 (Norfolk Cnty. Super. Ct. Mar. 16, 2010).  Barletta argued in that action that Zurich was obligated to defend and indemnify Barletta with respect to the third-party claims and to assume the costs of Barletta's contribution claim against Layne. *Id.*  The Superior Court relied, in part, on the findings of the jury in this case to reach the conclusion that the 3 Lindall Place and MBTA claims were excluded from the coverage of the policy obtained by Layne from Zurich.  *See id.* at 6-9.[2] However, the Superior Court also concluded that Zurich had a

_____

[2]  The Superior Court examined two endorsements providing coverage for "additional insureds," including Barletta: Endorsement No. CG-20-09-03-97 ("Endorsement 20-09") and Endorsement No. CG-20-10-07-04 ("Endorsement 20-10").  *Barletta Heavy Div., Inc. v. Zurich American Ins. Co.*, No. 06-01972 at 6-9 (Norfolk Cnty. Super. Ct. Mar. 16, 2010).  The Court concluded that Endorsement 20-09 was inapplicable because its title indicates that it is "for use when contractual liability coverage is not provided to you in this policy," *id.* at 6 & n.2 (explaining that "you" refers to Layne, the insured), and Layne had contractual liability coverage for the claims.  *Id.* at 6-7. The Court also concluded that Endorsement 20-10 did not apply because "Barletta was covered as an additional insured" under Endorsement 20-10 "for Layne's acts or omissions, or the acts or omissions of those acting on Layne's behalf, in the performance of Layne's responsibilities for the Red Line project."  *Id.* at 7-8.  Based on the jury's findings in this case that Layne's negligence was not a substantial factor in causing the damage to the cables and that Layne was not negligent in connection with the water damage at 3 Lindall Place, the Court concluded that Layne's acts or omissions did not cause the damages suffered by the third-party claimants and were therefore not covered by the policy.  *Id.* at 8.

duty to defend Barletta with respect to the claims because they arose out of Layne's work. *Id.* at 9-12.

After the Superior Court issued its judgment, Barletta agreed to settle its claim against Zurich for $200,000. Barletta and Zurich dismissed Barletta's claim for defense costs by joint stipulation. Barletta also concluded a settlement agreement with its insurer, the Charter Oak Fire Insurance Company ("Charter Oak"),[3] whereby Charter Oak agreed to pay Barletta $300,000 for Barletta's release of claims for indemnification with respect to the damages paid to the MBTA, Parella, and Lane.

Layne argues on cross motion that the $500,000 in total settlement payments exceeds the approximately $360,000 in damages that Barletta claims from Layne and that this Court should enter judgment for Layne because Barletta has been compensated for its losses. Barletta argues that Layne would be entitled to a credit for the $200,000 from Zurich but not the $300,000 from Barletta's insurer Charter Oak because Layne was obligated to provide primary insurance. Further, Barletta asserts that its claims against Layne, which include attorney's fees and interest, now total over $600,000.

---

[3] Charter Oak is a subsidiary of The Travelers Indemnity Company, and the parties refer to this entity as "Travelers" in their submissions.

The parties also dispute the significance of the Superior Court decision. Barletta, although maintaining that the exclusions do not apply to the third party claims, argues that if, in fact, the policy does not cover the claims as the Superior Court found, the gap in coverage is a separate grounds for Layne's breach of contract for failure to procure insurance compliant with the terms of the Subcontract. Layne asserts that the Superior Court decision is irrelevant hearsay, wrongly decided, and should not be relied on by this Court.

Barletta continues to assert its claim that Layne breached the Subcontract's insurance provisions by procuring insurance with a $500,000 deductible and not paying the amount covered by the deductible. Because the total damages asserted in the 3 Lindall Place and MBTA claims were less than $500,000, the amount of the policy's deductible, Barletta was unable to make a claim under that policy. Barletta argues that Layne had an obligation to indemnify Barletta because the damages arose out of its operations and because it failed to procure adequate insurance to cover those damages. Barletta seeks the amount of attorney's fees expended in this action under a provision of the Subcontract which makes Layne responsible for fees for actions related to Layne's breach.[4]

_____

[4] Article 15.3 of the Subcontract states:

In the event the General Contractor shall bring or be

## II. DISCUSSION

### A.  *Findings of the Jury*

Barletta asks me to disregard the findings of the jury in its motion for a new trial and motion for judgment as a matter of law that Layne's negligence was the sole proximate cause of the cable damage.  Barletta moves on the basis of its argument that the jury's finding that "[Layne] was negligent when it struck the MBTA cable but . . . that Layne's negligence was not a substantial contributing cause of the damage to the cable. . . . was against the weight of the evidence."  In its motion for judgment as a matter of law, Barletta submits that Layne's negligence was the sole proximate cause of the damage.

The specific questions put to the jury were as follows: "Was Layne negligent in connection with the severing of the MBTA cable?" and "Was Layne's negligence a substantial factor in causing damage to the MBTA cables?"  The jury answered "Yes" to the first question and "No" to the second question.  In other words, the jury found that Layne had breached a duty of care,

---------------

involved in any legal action on account of any breach of this Agreement by Subcontractor, Subcontractor agrees to pay General Contractor all reasonable expenses including counsel fees in addition to the amount of any judgment and costs which may be recovered, but only to the extent resulting from such breach and Subcontractor's failure to cure such breach in accordance with the provisions of this Agreement.

(as modified by Exhibit H to the Subcontract).

but that the breach was a not a substantial factor in causing the cable damage.

Applying the principle that "a district court may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice," *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 717 (1st Cir. 1994), I decline to set aside the jury's verdict in this case. The two questions cited above address the distinct issues (a) whether Layne was negligent and (b) whether that negligence was a substantial factor in causing the damage to the cable. "Negligence and causation are separate matters," *Roberts v. Southwick*, 614 N.E.2d 659, 665 (Mass. 1993). A positive finding of both is necessary to establish liability. *See, e.g.*, *Kent v. Commonwealth* 771 N.E.2d 770, 776-77 (Mass. 2002) (discussing the relationship between negligence and causation as elements of proof of liability). The fact that the jury found negligence without causation does not demonstrate that the finding was against the weight of the evidence or a miscarriage of justice. The trial record supports the jury's fact finding and consequently I will not disturb the jury's verdict.

## B. *Waiver and Release Defense*

In Barletta's renewed motion for judgment as a matter of law on Layne's waiver and release defense, it suggests that I

should set aside factual findings of the jury which give meaning to ¶¶ 10 and 22.  To the extent that Barletta seeks such relief, I decline to grant it.  There was a genuine factual dispute between the parties as to whether the severed cable was an "overhead utility" or "obstruction that interfere[d] with [Layne's] operations" within the meaning of ¶ 10 and whether the damage to Lindall Place was caused by "run off" under ¶ 22. There was sufficient evidence for the jury to come to its conclusions.  (*See* Section II.D.2 *infra* for a further discussion of these arguments.)

Barletta also argues that there is a conflict between Article 7.1 and ¶¶ 10 and 22.  Under Article 7.1, Layne is "responsible for all damage or expense to any person or any property arising from or in consequence of any act or omission of [Layne] under this Agreement."  However, because the jury found that (1) the cable was an "overhead utility" and an "obstruction" interfering with Layne's operation and (2) 3 Lindall Place was a "structure," Layne would not be held responsible for any damages to them according to ¶ 10. Moreover, under ¶ 22, since the jury found that the damage to 3 Lindall Place was caused by run-off, "all liability for control" of that "run-off from the work site is . . . the responsibility of others" and not of Layne.

Barletta argues that any exceptions to Article 7.1, such as those created in ¶¶ 10 and 22, would render that provision meaningless because it refers to "*all* damage or expense to any person or any property." (Emphasis added.) Although Article 7.1 was originally drafted without any exceptions, the parties may make modifications by mutual agreement. *See Devlin v. Newfell*, 175 N.E. 647, 648 (Mass. 1931). Layne and Barletta mutually agreed to the provisions in the change order and Layne's Proposal/Quotation, thereby modifying the agreement with the apparent intent that the modifications be effective and binding. The change order, which was issued by Barletta, specifically states that Layne's "quotation dated June 1, 2006 is included and part of this Agreement," although "conflicts with the Contract requirements" are excepted. However, contrary to Layne's interpretation, Article 7.1 need not be interpreted as in conflict with exceptions added by modification.[5] Under Massachusetts law, "[a] contract should be construed in such a way that no word or phrase is made meaningless by interpreting another word or phrase." *Lexington Ins. Co. v. All Regions Chemical Labs, Inc.,* 647 N.E.2d 399, 400 (Mass. 1995). In these

---

[5] The change order's reference to the "Contract" rather than the "Subcontract" or "Agreement" implies that this qualification actually refers to the General Contract between Barletta and the MBTA. In its preamble, the Subcontract refers to the Barletta-MBTA contract as the "General Contract," and the Subcontract as the "Agreement" or "Subcontract."

circumstances, the Subcontract can be construed to give force and effect to both Article 7.1 and ¶¶ 10 and 22. I find that, as a matter of law, the provisions of Schedule A are enforceable, incorporated terms of the Subcontract.

**C.    *Claim for Breach of Insurance Provision***

Barletta argues that the deductible in the insurance policy obtained by Layne from Zurich fails to comply with Article 3.1 and Exhibit C to the Subcontract. Alternatively, Barletta argues that Layne's failure to compensate Barletta for losses falling in the deductible violate these provisions. These provisions require Layne to obtain a comprehensive general liability insurance policy with a $2,000,000 limit, but they are silent with respect to any deductible. Barletta argues that the $500,000 deductible constitutes a violation of Layne's contractual obligation. Layne counters that it did not violate Article 3.1 or Exhibit C because they contain no obligation with respect to deductibles and do not even mention deductibles. Layne points out that Barletta could have contracted for a deductible-free policy or inquired as to the amount of the deductible in the Zurich policy, but it did neither. Layne also argues that the damages at issue are excluded from the insurance policy for various reasons and therefore contends that Barletta is not entitled to any recovery from the Zurich policy, making the deductible inapplicable.

Barletta moved for judgment as a matter of law on its insurance arguments. I solicited additional briefing from the parties on the application of the deductible, and although Layne never made a motion with respect to the insurance issues, I have effectively granted summary judgment in its favor pursuant to FED. R. CIV. P. 56(f).[6] *See also Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 431 (1st Cir. 1998) (holding that summary judgment may be granted by a district court *sua sponte* "if the litigation is sufficiently advanced that both parties have had a reasonable opportunity to present any material evidence in their favor" and if the party against whom judgment is entered "was afforded appropriate notice and a fair opportunity to present its arguments").

---

[6] In its Post-Trial Memorandum (Docket No. 119), Layne argued for judgment on the insurance issues based solely on my prior ruling, discussed *infra* at footnote 7, however Layne never submitted a motion with respect to this argument. Accordingly, my grant of summary judgment is made under Rule 56(f)(1), pursuant to which a court may grant summary judgment for a nonmovant, and not Rule 56(f)(2), pursuant to which a court may grant a motion on grounds not raised by a party.

<u>1.</u>  <u>Deductible</u>[7]

In interpreting a contract, Massachusetts courts "must 'construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished.'" *Starr v. Fordham*, 648 N.E.2d 1261, 1269 (Mass. 1995) (quoting *Bryne v. Gloucester*, 8 N.E.2d 170, 171 (Mass. 1937)).  The object sought to be accomplished by Article 3.1 was to place on Layne the burden of procuring insurance for the losses arising out of its work on the Subcontract and thereby give Barletta independent security for payment for damages. Layne would have frustrated this object if it had obtained a policy with a deductible so large that it virtually negated the policy (*e.g.*, a deductible for the entire amount of $2,000,000 or for an unreasonably large portion, such as $1,500,000). Thus, although there is no language related to deductibles, the object of the contract cannot be served without a finding of some responsibility with respect to deductibles.  Assigning a

---

[7] Layne has asserted throughout the trial and post-trial proceedings that the denial of Barletta's motion for summary judgment with respect to the deductible established the "law of the case."  Although it is certainly permissible for a court to follow a previous denial of summary judgment, the First Circuit has held that it is "simply wrong that [a] court's earlier ruling constitutes the law of the case: 'an initial denial of summary judgment does not foreclose, as the law of the case, a subsequent grant of summary judgment on an amplified record.'"  *Fisher v. Trainor*, 242 F.3d 24, 29 n.5 (1st Cir. 2001) (quoting *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 955 F.Supp. 203, 210 (S.D.N.Y. 1997)).

reasonable obligation with respect to deductibles to Layne is necessary to find that the insurance provision was "employed with a purpose" and to give it "meaning and effect." *Clark v. State Street Trust Co.*, 169 N.E. 897, 904 (Mass. 1930).

A very large deductible would clearly violate Layne's insurance obligation, but the Subcontract gives no hint as to what magnitude of deductible would be compliant. In general, Article 3.1 and Exhibit C do not specify the contours of the requisite policy, but rather leave Layne with discretion to choose among various policies to fulfill its obligation. Only one interpretation simultaneously comports with the discretion given to Layne with respect to terms of the insurance policy, the lack of agreement regarding a suitable deductible amount, and the placing of the burden for procuring insurance on Layne. That interpretation is that the Subcontract does not restrict Layne's ability to obtain insurance with a deductible in some amount, but means that Layne must be responsible for paying any such deductible applicable to a claim of Barletta falling under the policy.

This interpretation is supported by the findings of other courts that the policyholder is responsible for deductibles applicable to an additional insured. *See Dillingham Tug & Barge Corp. v. Collier Carbon & Chemical Corp.,* 707 F.2d 1086, 1091 (9th Cir. 1983) (finding that the policyholder became a self-

insurer for a $1,000,000 deductible where the contract required the policyholder to insure a barge to its "full value"); *Chevron U.S.A., Inc. v. Bragg Crane & Rigging Co.,* 180 Cal.App.3d 639, 646 & n.8 (Cal. Ct. App. 1986), (noting that a "policy's $100,000 deductible . . . was not contracted for or agreed upon where the contract was silent as to deductible" and that the policyholder "failed to comply with the terms of the contract when it obtained insurance with a $100,000 deductible"); *Hoverson v. Herbert Constr. Co.*, 283 A.D.2d 237, 238 (N.Y. App. Div. 2001) ("[Policyholder] did not breach its insurance procurement obligation . . . since [it] concedes that it is obligated to indemnify additional insureds for any covered liability within the deductible . . . ."). Indeed, the very deductible endorsement Layne obtained from Zurich indicates that Layne is responsible for payment of the deductible. This endorsement states at Section D, that Zurich "may pay any part or all of the deductible amount to effect settlement of any claim or 'suit' and, upon notification of the action taken, *you* shall promptly reimburse us for such part of the deductible amount as has been paid by us." Deductible Liability Insurance, CG 03 00 01 96 (emphasis added). "You" is defined in the policy as Layne, the "Named Insured." Preamble, Commercial Liability Coverage Form CF 00 01 12 04. This provision "clearly makes it the named insured's responsibility to reimburse the deductible to the insurer." Donald S. Malecki et al, The Additional Insured Book

19-20 (5th ed. 2004) (further explaining that the question

"whether it is the named insured or an additional insured that

is responsible for the deductible" is raised from time to time

and that contract drafters "try to deal with the issue . . .

within the underlying business contract" but "this would not be

necessary if the policy were to include the standard" quoted

language). This language was drafted by the Insurance Services

Office, Inc. ("ISO") (CG 03 00), is commonly used as a part of

the deductible endorsement for commercial general liability

policies, and has been interpreted by courts to mean that the

named insured is responsible for the deductible. *See id*. at 19-

20; *Hartford Accident & Indem. Co. v. U.S. Natural Res., Inc.*,

897 F.Supp. 466 (D. Or. 1995).[8] Layne's procurement of

insurance with this common deductible language supports the

---

[8] The endorsement language goes to the issue of which party
— the policyholder or the additional insured — would have the
obligation to the insurer to pay the deductible. Courts that
have addressed this question have generally determined that the
policyholder has this obligation. *See Hartford Accident &
Indemnity Co. v. U.S. Natural Resources, Inc.*, 897 F.Supp. 466,
473 (D. Or. 1995) (finding that an insurance policy containing
the ISO drafted deductible endorsement put the burden on the
named insured to pay the deductible amount owed to insurance
company); *Cont'l Cas. Co. v. Campbell Design Grp., Inc.*, 914
S.W.2d 43 (Mo. Ct. App. 1996) (holding that the payment of the
deductibles on a professional liability policy is an obligation
running from the insured to the insurer and does not bind
individual defendants not party to the insurance contract). That
the obligation to pay the insurer for any deductibles owed falls
to the policyholder supports the conclusion that the deductible
is the responsibility of the policyholder and not the additional
insured.

conclusion that the parties had agreed that Layne would be responsible for the deductible.

Layne relies primarily on two Texas cases, *Phillips Petroleum Co. v. St. Paul Fire & Marine Ins. Co.*, 113 S.W.3d 37 (Tex. App. 2003), and *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635 (Tex. App. 2005), to support the proposition that it has no responsibility with respect to the payment of the deductible. *Phillips Petroleum* involved a dispute as to the type of insurance policy required under the contract. In that case, the absence of a contract term addressing the type of policy required was fatal to the finding of a contractual obligation to procure a "non-wasting" policy, which is a policy with an unlimited duty to defend, the costs for which do not accrue to the liability limits of the policy. *Philips Petroleum* is consistent with the conclusion that the presence of the deductible does not violate the Subcontract, because the Subcontract contains no term addressing deductibles; but the case does not shed light on the question of which party is responsible for the payment of any applicable deductible.

In *Helmerich & Payne*, the court found that a provision obligating a contractor to pay all deductibles applicable to an operator named as an additional insured was negated for pollution costs subject to a release providing that "[n]otwithstanding anything to the contrary contained" in the contract, the operator "shall protect, defend and indemnify

21

[contractor] from and against all claims, demands, and causes of action" and "shall release [contractor] of any liability" for certain pollution-related costs. *Helmerich & Payne*, 180 S.W.3d at 638-39 (emphasis omitted). Layne argues that the releases found in ¶¶ 10 and 22 of Schedule A similarly operate to release Layne from any liability for the damage to the cable and 3 Lindall Place. Layne's argument is unconvincing because of the differences between the Subcontract and the agreement at issue in *Helmerich & Payne*. In contrast to the contract at issue in *Helmerich & Payne*, which released the contractor from liability "notwithstanding" the insurance provisions, Layne's quotation, including Schedule A, was "included and part of this agreement with the exception of conflicts with Contract requirements." "Contract" in this context refers to the General Contract. *See supra* Note 5. Unlike in *Helmerich & Payne,* the Schedule A releases do not explicitly supercede other terms of the Subcontract and release Layne from liability related to the insurance provision.

Layne's obligation to procure insurance is broader than its responsibility to indemnify Barletta as set out in Articles 7.1 and 4.1. According to Exhibit C to the Subcontract, Layne must purchase insurance for claims "which may arise out of or result from" its operations. Under Article 7.1, Layne is "fully responsible for all damage or expense to any person or property arising from or in consequence of any act or omission of [Layne]

under this Agreement," and under Article 4.1 it must indemnify
Barletta for those claims and losses "caused in whole or in part
by any negligent act or omission of the Subcontractor." The
insurance provision, covering claims arising out of Layne's
*operations*, is more broadly worded than the liability and
indemnification provisions, covering claims arising out of
Layne's *acts or omissions*. As a result, there is a set of
claims for which Layne must procure insurance but for which it
is not liable under the Subcontract. Layne's liability is
narrowed further by Schedule A to the change order which removed
certain specific losses from Layne's responsibility.

Massachusetts courts recognize the difference between the
obligation to procure insurance and the obligation to indemnify.
In *Great N. Ins. Co. v. Paino Assocs.*, 364 F.Supp.2d 7 (D. Mass
2005), Judge Keeton distinguished indemnification and insurance
provisions in the application of MASS. GEN. LAWS ch. 186, § 15, a
statute prohibiting lease terms whereby the tenant indemnifies
the landlord for losses due to the landlord's negligence. In
considering a lease agreement requiring a tenant to purchase
insurance, Judge Keeton noted that "[c]ourts in other
jurisdictions have maintained the distinction between
contractual terms obligating one party to carry insurance for
the benefit of another and contractual terms for
indemnification," 364 F.Supp.2d at 23, and he concluded that
Massachusetts courts would do the same. His prescient

prediction was adopted by the Supreme Judicial Court in *Norfolk & Dedham Mut. Fire Ins. Co. v. Morrison*, 924 N.E.2d 260, 268 (Mass. 2010), which summarized the approach of other jurisdictions and concluded that it "agree[d] with the reasoning . . . that an agreement in a lease that the tenant indemnify or hold harmless the landlord is distinct from an agreement to purchase insurance on the landlord's behalf."  Although both of these cases address lease agreements, *Morrison* cites to a case involving a service agreement, implying that the principle is applicable to any type of contract.  *Id.* (citing *Roblee v. Corning Cmty. Coll.*, 134 A.D.2d 803, 804 (N.Y. App. Div. 1987)). I find no reason to limit the principle to lease agreements.  As a result, I apply that principle here and conclude that limitations on Layne's indemnification do not affect its obligation to procure insurance.

In conclusion, I find that Layne did not breach its contract with Barletta when it procured insurance with a $500,000 deductible, but I also find that Layne is contractually responsible for the payment of any applicable deductible, a responsibility which is not negated by the releases found in Schedule A to the change order.

2.   Exclusion of Damages from the Zurich Policy

In order to determine whether Layne has breached its duty to pay amounts subject to the deductible, it is first necessary to determine whether Barletta's claims are covered by the

24

insurance policy.  It was not until the exchange of post-trial motions and briefs that Layne raised the argument that the claims may be excluded from coverage.  Prior to that time, Layne had not opposed Barletta's position that the claims were covered by the policy, but had maintained they were subject to the deductible.  Layne now argues that the claims were excluded from the policy, and thus not subject to the deductible.  For its part, after the Superior Court decision came down, Barletta took the position (without conceding that the exclusions apply) that the exclusion of the claims from the coverage of the Zurich policy would also constitute a breach of Layne's insurance procurement obligation.  This contention is addressed in the next section.

Layne reaches the conclusion that the policy excludes the claims through an interpretation of the policy that differs from that of the Superior Court.[9]  *See supra* note 2.  In particular, Layne raises the argument that Barletta's claims are barred from Endorsements 20-09 and 20-10, which extend coverage to additional insureds, under exclusions in the Commercial General

_____

[9]  The decision of the Superior Court is not binding upon Layne under Massachusetts' doctrine of *res judicata* because claim preclusion does not exist unless both parties were privy to the prior action.  *See, e.g., DaLUZ v. Dep't of Corr.*, 746 N.E.2d 501, 505 (Mass. 2001) (explaining that a necessary element of claim preclusion is "the identity or privity of the parties to the present and prior actions").

Liability Coverage Form ("CGL Form") and Endorsement 20-09,[10] for (a) property damage "for which [Barletta is] obligated to pay damages by reason of the assumption of liability in a contract or agreement," Endorsement 20-09 § B.2.a; CGL Form § I.2.b; (b) property damage "arising out of any act or omission of [Barletta] . . . other than the general supervision . . . of [Layne's] ongoing operations," Endorsement 20-09 § B.2.c; and (c) damage to "[p]roperty in the care, custody, or control of [Barletta]," id. § B.2.d.2; CGL Form § I.2.j.4.

*a. Contractual Liability Exclusion*

Layne argues that Barletta assumed the responsibility for any damage to the MBTA's cables and 3 Lindall Place and is therefore subject to an exclusion for damages "for which the insured[] [is] obligated to pay damages by reason of the assumption of liability in a contract or agreement." Endorsement 20-09 § B.2.a.

With respect to the cable, Layne contends that the following provision in the General Contract shifts all liability with respect to damages to Barletta: "Any equipment, cables and structures damaged during construction shall be replaced with identical material tested and placed in service by the Contractor . . . . Any resultant costs or delays to the project

---

[10] Endorsement 20-09 contains certain exclusions that supercede, or are in addition to, those contained in the CGL Form. Endorsement 20-10 contains only minimal exclusions which do not supercede the relevant exclusions in the CGL Form.

shall be the full responsibility of the Contractor."  General

Contract, § 16801 1.01(f)(2).  Pursuant to this provision,

Barletta is liable to the MBTA for any damage to the cables

occurring during construction, regardless of whether a breach of

contract or tortious conduct of Barletta caused the damage.

Barletta assumed liability which it would otherwise not incur

under its contractual arrangements and agreed to hold the MBTA

harmless with respect to any damage to the cable.  As a result,

if Barletta is liable for the cable damage *by reason of* the

above-quoted contractual provision, such a claim would be

excluded from coverage of the Zurich policy under the

contractual liability exclusion.  *See USM Corp. v. First State

Ins. Co.*, 652 N.E.2d 613, 615 (Mass. 1995) ("Certainly a

contractual agreement to indemnify or hold another harmless

would be a liability assumed, and thus excluded from the

coverage of [an insurance policy with a contractual liability

exclusion].").

 Layne has failed to demonstrate that Barletta had a similar

no-fault contractual obligation to pay for the water damage at 3

Lindall Place, or that such a no-fault obligation is at issue

here.  Layne relies on the following provision in the MBTA

contract with respect to the water damage to 3 Lindall Place:

> Contractor shall keep public streets and private
> properties clean of all soil, rock, dirt and other
> debris resulting from Contractor's operations and
> hauling of excavated and backfill material . . . .

27

> Nothing contained in this provision shall be construed
> to absolve or relieve the Contractor from his total and
> sole responsibility and liability as provided for under
> this Contract, for any and all loss or damage due to
> any cause whatsoever, as may occur by reason of his
> failure to keep the streets clean.

General Contract § 01560 1.06(L).  The plain reading of this provision does not capture water damage to 3 Lindall Place because water is not soil, rock, dirt or other debris nor is it implicated in the obligation to keep the streets clean.  On its face, this provision does not confer contractual liability on Barletta, and Layne has not submitted sufficient evidence to show that is the case.  As a result, I find that the contractual liability exclusion does not apply to the damages to 3 Lindall Place.

I conclude, however, that the contractual liability exclusion does not apply to liability for damages that Barletta "would have in the absence of the contract or agreement." Endorsement 20-09 § B.2.a; CGL Form § I.2.b(1).  Layne argues that the exception does not apply to Barletta because it is "estopped from claiming that it would have been liable" (i.e. for reasons of negligence) given the arguments and testimony provided at trial.  However, Layne itself, when advancing other arguments, asks me to find that Barletta *was* negligent.

Although I decline to adopt Layne's arguments as such, I also note that Barletta, as the plaintiff, has the burden of proving that the claim is covered by the insurance policy,

thereby creating liability on the part of Layne for the deductible. As a factual matter, I find it has failed to do so here. Based on the record before me, I find that Barletta cannot show that it would have been liable for the MBTA claim absent the cited General Contract provision.

   *b. Exclusion for Acts or Omissions of Barletta*

   Layne's second asserted basis for exclusion is that the property damage arose "out of any act or omission of [Barletta] or any of [its] 'employees,' other than the general supervision by [Barletta] of [Layne's] ongoing operations performed for [Barletta]." Layne raises allegations that the damage claims "arose out of Barletta's failure to perform independent obligations under the General Contract, the Subcontract, and the Change Order that did not constitute general supervision of the work of Layne" and in particular alleges that Schedule A took protection of the cable and 3 Lindall Place as well as control of run-off "out of the scope of Layne's work" and made them Barletta's sole responsibility. It is unclear that this allocation of responsibility necessarily leads to the conclusion that the damage arose out of an act or omission of Barletta, but as a factual matter on the record before me, I find Barletta is unable to show that either claim did not arise out of its acts or omissions and therefore cannot demonstrate that the claims are not excluded by the acts or omissions exclusion and are

instead subject to the deductible establishing Barletta's responsibility for payment.

   *c. Exclusion for Property Under the Care, Custody, or Control of Barletta*

I find that neither the water damage nor the cable damage falls under the exclusion for damage to property in the "care, custody, or control" of Barletta. Layne points to ¶¶ 10 and 22 of Schedule A to the change order in an attempt to establish that the cable and 3 Lindall Place were Barletta's responsibility. In addition, with respect to the cable, Layne cites the obligations imposed on Barletta by the General Contract which include the protection of the "cables for the duration of construction" and also require Barletta to "furnish and install removable protective structures to preclude any damage to signal facilities during demotion and construction" or "remove and reinstall signal facilities as described under the relocation term with this section . . . ." General Contract § 16801 1.01. Another provision mandates that the "cables passing through the work areas shall be covered or elevated to protect them from damage and to eliminate tripping hazards to employees." *Id.* § 01568-52 6.1.3(c).

The fact that Barletta had certain contractual responsibilities to protect the cable and/or certain structures such as 3 Lindall place does not mean that it has been entrusted with their "care, custody, or control." In construing this

term, Massachusetts courts, like others "look to who has possession and who has control of the property." *Crane Serv. & Equip. Corp. v. United States Fid. & Guar. Co.*, 496 N.E.2d 833, 835 (Mass. App. Ct. 1986). In so doing, "[t]he cases have limited this 'control' to the particular object of the insured's work, usually personalty, and to other property which he totally and physically manipulates." *Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 604 (5th Cir. 1991) (internal quotation omitted) (finding that a construction company working on a foundation did not have care, custody, or control of the rest of the house); *see also* Am. Jur. Ins. 2d § 695 ("Where the property damaged is merely incidental to the property upon which the work is being performed by the insured, it is not in the care, custody, or control of the insured within the meaning of the exclusion clause."). This interpretation comports with the "broad purpose of the comprehensive general liability insurance policy, so far as it relate[s] to property," which is "to cover property other than that which was [the insured's], i.e., other people's property." *Crane Serv. & Equip. Corp.*, 496 N.E.2d at 834. Barletta's responsibilities with respect to the cable and 3 Lindall Place were merely incidental to its work for the MBTA, because it was itself not working on the cable or 3 Lindall Place. As a result, the "care, custody, or control" exclusion does not apply to the claims at issue here.

In summary, I find that Layne has raised two exclusions which appear to apply to the claims. As a result, Barletta has the burden of demonstrating that Layne has breached the Subcontract by failing to pay the deductible with respect to claims properly covered under the policy. I conclude it cannot do so, and in certain filings, appears to concede that the exclusions apply to the claims. As a result, I cannot conclude that the losses are covered by the Zurich policy.

### 3. Operation of Exclusion and Obligation to Obtain Insurance

Barletta argues that the operation of an exclusion negating coverage for the claims at issue constitutes a breach of Layne's obligation to obtain insurance for claims for property damage which "arise out of or result from" Layne's operations. The exclusions cited by Layne are contained in standard forms developed by the ISO and are of a type often found in commercial general liability[11] policies. *See* 9A Couch Ins. § 129:31 ("Commercial general liability policies generally contain provisions specifically excluding from coverage liability

------

[11] Barletta emphasizes the fact that the Subcontract called for the procurement of a *comprehensive* general liability policy, perhaps to argue that the policy required differs in some way from a *commercial* general liability policy. The standard form for this type of insurance policy was originally promulgated under the title "comprehensive general liability," but "comprehensive" was changed to "commercial" in 1986. 9A Couch on Ins. § 129:1. These terms are often used interchangeably. *See, e.g.*, Shane R. Heskin, *Commercial General Liability Policies*, MASSACHUSETTS LIABILITY INSURANCE MANUAL § 4.1 (2009).

assumed by the insured under a contract."); *id.* § 126:20
("Policies of liability insurance, especially those covering the
operations of contractors and similar businesses, commonly
contain provisions specifically excluding from coverage
liability for injury or damage to property in the 'care,
custody, or control of the insured.'").  In the normal course of
the business engaged in by the parties, these exclusions form
the contours of a commercial general liability policy.  It would
be unreasonable for Barletta to expect that there would be no
exclusions in the policy obtained by Layne, and in particular no
exclusions of the type at issue here.  For these reasons, I find
that Layne did not violate the Subcontract by procuring
insurance containing the exclusions outlined above.

**D.  *Layne's Ch. 93A Claim***

Layne brought a counterclaim against Barletta seeking
multiple damages and attorney's fees under the Massachusetts
Consumer Protection Act, MASS. GEN. LAWS ch. 93A.  Layne alleges
that Barletta's withholding of certain payments due to Layne
constituted unfair or deceptive acts prohibited by that statute.
MASS. GEN. LAWS ch. 93A, § 2(a).  Barletta withheld payment
through the trial but has since made payment to Layne of the
amount due.

In its Post-Trial Memorandum Layne argues that the withholding of payment violated both the General Contract[12] and the Subcontract and that payment could not have been withheld on a good faith belief that Barletta was entitled to damages for a breach of contract by Layne. Layne argues that Barletta's actions constitute a breach of the implied covenant of good faith and fair dealing and therefore should be treated as unfair and deceptive trade practices.[13] Under Massachusetts law, a mere breach of contract does not violate ch. 93A. *Whitinsville Plaza, Inc. v. Kotseas*, 390 N.E.2d 243, 251 (Mass. 1979) (finding that allegations of violation of a commercial agreement alone are "not sufficient to support a claim under c. 93A"). In

---

[12] The Subcontract states in the preamble that Layne "is desirous of entering into a Subcontract with the General Contractor on the terms and conditions of the Contract Documents and as hereinafter set forth." Layne argues that, in entering the Subcontract, it relied on the term in the General Contract which requires the MBTA's prior approval for the delay or postponement of Barletta's payment to its subcontractors. However, the Subcontract does not contain a similar guarantee and provides, instead at § 15.1, that "[i]n the event of any breach by [Layne] . . . the Contractor may . . . [d]educt from any payment otherwise due or becoming due all sums chargeable to [Layne] and damages due from said breach."

[13] A breach of contract which breaches the implied covenant of good faith and fair dealing may be the basis for a finding fo unfair trade acts. *See, e.g.*, *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806 (Mass. 1991). "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'" *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 924 N.E.2d 696, 704 (Mass. 2010) (quoting *Anthony's Pier Four*, 583 N.E.2d at 820).

interpreting ch. 93A, the First Circuit has noted that
"withholding payment based on a genuine dispute about what a
contract requires does not violate Chapter 93A." *Jasty v.
Wright Med. Tech., Inc.*, 528 F.3d 28, 38 (1st Cir. 2008).

In determining whether the implied covenant of good faith
and fair dealing has been violated, "[t]here is no requirement
that bad faith be shown; instead, the plaintiff has the burden
of proving a lack of good faith." *T.W. Nickerson, Inc. v. Fleet
Nat'l Bank*, 924 N.E.2d 696, 704 (Mass. 2010). Layne argues that
Barletta could not have believed in good faith that (1) Layne
breached the Subcontract by failing to obtain deductible-free
insurance; (2) Barletta was entitled to indemnification in light
of the releases in Schedule A to the change order; (3) the
indemnity provision applied to the damages to the cable and 3
Lindall Place; or (4) Barletta was entitled to contribution from
Layne for the damages to the cable and 3 Lindall Place.

<u>1.    Failure to Obtain Deductible-Free Insurance</u>

Layne argues that, because there is no provision in the
Subcontract requiring Barletta to obtain a policy free from a
deductible, Barletta could not have had a good faith belief that
Layne breached the agreement by failing to purchase such a
policy. Layne is correct that the Subcontract is devoid of any
obligation with respect to the deductible, as noted *supra*
Section II.C.1, but Barletta also argued, in the alternative,

35

that "Layne, at the very least, had to step into the shoes of the insurer and pay the amounts within the deductible." Although the contract did not address deductibles, the discussion at Section II.C.1 above demonstrates that the payment of any applicable deductible is in fact Layne's responsibility. As a result, I conclude there was ample basis for Barletta's good faith belief that it was entitled to damages for any losses subject to the deductible.

> 2.   Entitlement to Indemnity Under the Contract in Light of Releases

Layne argues that Barletta could not have had a good faith belief that it was entitled to indemnity from Layne for the claims in light of the releases in ¶¶ 10 and 22 of Schedule A to the change order. Layne cited Barletta's failure to produce evidence at trial regarding the definitions of "structure" and "obstructions" in support of its position and argued that Barletta's arguments amounted to an attempt to deceive the Court and the Jury. I find nevertheless that Barletta had a good faith basis for arguing that the claims were not covered by the releases. There was a genuine question as to whether the cable, which was lying on the ground at the time it was damaged, constituted an "overhead utility" and/or an "obstruction that interfere[d] with [Layne's] operations." Although the jury ultimately found that the cable qualified as both, Barletta had

a plausible argument for an alternative finding.  At trial,
Barletta had a basis to argue in support of its position.

With respect to Barletta's position that 3 Lindall Place
did not qualify as a "structure," although it may seem frivolous
to make such an argument, Barletta maintained that the term
"that interfere with [Layne's] operations" modified
"structures."  This was a possible reading of the provision.
Barletta appeared temporarily to abandon this argument during
its closing, apparently in light of the fact that the verdict
slip did not reflect the interpretation, but Barletta renewed
the argument in its post-trial motions.  Layne has failed to
demonstrate an absence of good faith in Barletta's pursuit of
this interpretation.

### 3.  Application of the Indemnity Provision

Layne argues that Barletta could not have believed in good
faith that the indemnification provision at Article 4.1 of the
Subcontract applied to the claims at issue because, Layne
alleges, Barletta's negligence caused the damages.  Barletta
counters that (a) it was not negligent with respect to the
damages at issue and (b) even if it were, the indemnification
provision applies to those cases where Barletta is only
contributorily negligent.  Layne argues that Barletta cannot

have a good faith basis for arguing that Barletta's alleged negligence does not bar application of the indemnity provision.[14]

I find no reason to conclude that Barletta's argument was not made in good faith. In particular, Barletta has a good faith basis for arguing that, even if it were contributorily negligence, Layne would still have a duty to indemnify Barletta for some portion of a claim.

### 4. Barletta's Entitlement to Contribution from Layne

Layne argues that Barletta failed to present evidence sufficient to show that Layne was negligent in connection with the damages with respect to the 3 Lindall Place and the MBTA claims. However, the fact that the jury returned a verdict finding Layne negligent in connection with the severing of the MBTA cable demonstrates that there was a good faith basis for this argument with respect to the cable involved in the MBTA claims, upon which Barletta prevailed at least in part.

---

[14] Layne relies, in certain of its submissions, on the drafting history of this provision to support its argument. In particular, it cites the deletion, in Exhibit H to the Subcontract, of the word "sole" before "negligence" in the portion of the indemnity provision that states that Layne "shall not be obligated under this contract to indemnify the Owner or Contractor for claims arising out of the negligence or willful misconduct of the Owner or the Contractor." However, this deletion could be open to more than one interpretation. For example, it could simply mean that Layne is not responsible for the indemnification of Barletta's sole *or contributory* negligence, although it may be liable for some portion of damages for which Barletta is contributorily negligent.

Regarding the water damage at 3 Lindall Place, Barletta did establish a causal relationship between the drilling and the damage, as is demonstrated by the finding that water damage arose out of the drilling operations. Barletta offered a somewhat strained argument that Layne was negligent because it should have used less water in connection with its drilling operations, which would have prevented the damage.

After evaluating Layne's arguments, I conclude that, although certain of Barletta's claims have proven unsuccessful, Layne has failed to establish a basis for its ch. 93A claim.[15]

## IV. CONCLUSION

For the foregoing reasons, by electronic endorsement, I have denied Layne's motion for judgment as a matter of law (Dkt. No. 89); denied Barletta's motions for judgment as a matter of law with respect to Layne's release and waiver defense (Dkt. No. 91 and renewed motion Dkt. No. 117) and with respect to findings of negligence (Dkt. No. 92) and its motion for a new trial (Dkt. No. 113); I have granted in part and denied in part Barletta's motions for judgment as a matter of law on the insurance claims (Dkt. Nos. 93 and 118); I have denied Layne's cross motion for judgment as a matter of law based on Barletta's settlement with Zurich and Charter Oak (Dkt. No. 163); I have granted Barletta's

---

[15] For essentially the same reasons I find no basis to impose sanctions under FED. R. CIV. P. 11 upon Barletta's counsel for pressing a reasonably contested dispute.

motion for judgement as a matter of law on Layne's ch. 93A claim
(Dkt. No. 115); I have denied Layne's motion for legal fees (Dkt.
No. 124); and I have denied Barletta's motion for judgment as a
matter of law on Layne's breach of contract and unjust enrichment
counterclaims (Dkt. No. 90).  In accordance with the electronic
order of March 31, 2011, the parties shall submit on or before
April 26, 2011 a joint status report, including a form of
judgment consistent with this Memorandum proposing the manner in
which this case should be reduced to final judgment.


                              _/s/ Douglas P. Woodlock_____
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE